IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | Crim. No. 11-055-SLR |
| WILLIAM BONEY, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM ORDER

At Wilmington this 81<sup>r</sup> day of March, 2012, having considered defendant's motion to suppress and the papers submitted in connection therewith:

IT IS ORDERED that, for the reasons that follow, said motion (D.I. 17) is denied.

1. **Introduction.** On May 24, 2010, a federal grand jury returned a one-count indictment with notice of forfeiture against defendant William Boney on the charge of conspiracy to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) & 846. (D.I. 3) Defendant has moved to suppress statements and evidence[1] seized from his residence on November 7, 2010. (D.I. 17) An evidentiary hearing was held on November 14, 2011, with two law enforcement witnesses testifying.[2] (D.I. 27) The matter is fully briefed. (D.I. 31, 32, 33) The court has jurisdiction pursuant to 18 U.S.C.

---

[1] One kilogram of cocaine, 48.5 grams of cocaine and 28 MDMA/Ecstacy pills. (D.I. 22-2)

[2] Drug Enforcement Administration ("DEA") Special Agent David Hughes ("Hughes") and DEA Task Force Officer Larry Collins ("Collins") testified on behalf of plaintiff. Defendant presented no live witnesses, but relied on his affidavit submitted in support of his motion to suppress. (D.I. 27 at 83)

§ 3231.

2. **Findings of Fact**.[3]  On or about November 1, 2010, Hughes[4] received information from a cooperating defendant ("CD") about defendant's involvement in brokering multi-kilogram cocaine transactions on behalf of members of a Mexican drug cartel. (D.I. 27 at 5, 7)  Hughes considered the CD a reliable source because he previously provided useful information to DEA that led to several arrests and prosecutions. (*Id.* at 5)  With the assistance of the CD, Hughes commenced an investigation into defendant's drug activity.

3. On November 7, 2010, at the direction of Hughes, the CD placed several telephone calls[5] to defendant about purchasing seven kilograms of cocaine. (*Id.* at 6)  During the calls, defendant confirmed that the drug transaction would occur some time that day at his residence, 2410 Darney Lane, Wilmington, Delaware ("the residence"). (*Id.* at 12; GX2a - 2d)  Defendant described the sellers as "serious players" and members of a Mexican drug cartel operating out of New Jersey. (*Id.* at 10)  Defendant explained that the sellers would conduct counter-surveillance, including surveying the area around the residence, to protect themselves.  He indicated that the CD would be

---

[3]Pursuant to Federal Rules of Criminal Procedure 12(d).

[4]Hughes has been a DEA special agent for over 12 years. (*Id.* at 3)  The parties stipulated to his expertise as a drug enforcement agent. (*Id.* at 4)

[5]The CD and defendant engaged in several telephone conversations starting at approximately 10:20 a.m. and concluding at 5:30 p.m.  Six of the calls were monitored and recorded. (GX1)  Because Hughes was involved in other aspects of the investigation and not always present with the CD, some of the calls were unrecorded. (D.I. 27 at 6)  When unrecorded calls were received by the CD, Hughes was immediately informed. (*Id.* at 7)

2

searched upon entry at the residence and would not be allowed to bring a cell phone because it could be used a recording device. (*Id.* at 11-12, 56) To prevent detection and ensure safety, Hughes[6] decided to send the CD to the residence without a recording device. (*Id.* at 11)

4. Defendant and the CD agreed to meet at 11:30 a.m. (*Id.* at 12) The meeting time subsequently changed to 2:30 p.m. Defendant advised the CD to wait patiently and assured him the deal would take place. At approximately 3:00 p.m., the CD traveled to the residence.

5. In response, approximately nine DEA agents and additional law enforcement officers established surveillance of the residence. (*Id.* at 13) While conducting surveillance, these officers were in plain clothes and used four unmarked vehicles in an effort to avoid detection. (*Id.* at 13-14)

6. At approximately 3:15 p.m., the CD arrived at the residence. (*Id.* at 16) A maroon Suburban sports utility vehicle ("the Suburban") was parked in the driveway. (*Id.* at 19) The CD entered the residence and met with defendant and three Hispanic males.[7]

---

[6]Hughes also expected that, in a drug transaction of this magnitude and involving members of a Mexican drug cartel, weapons would be present. (*Id.* at 64)
[7]These individuals were later identified as Francisco Martinez ("Martinez"), Ramon Nunez ("Nunez") and Antonio Mendoza ("Mendoza"). (D.I. 22-2) On January 13, 2011, a federal grand jury returned a two-count indictment against Martinez and Mendoza on charges emanating from the facts at bar. *United States v. Martinez and Mendoza*, 11-cr-006-LPS (D. Del. 2010). Martinez entered a guilty plea to the charge of conspiracy to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) & 846. (*Id.* at D.I. 70) He was sentenced, inter alia, to 60 months of imprisonment. (*Id.* at 76) Mendoza also entered a guilty plea to the charge of conspiracy to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) & 846; however, he has not been sentenced. (*Id.* at D.I. 51)

7. After about ten minutes, the CD left the residence and called Hughes from a secure location for a debriefing. (*Id.* at 19 , 69) The CD advised that defendant gave him one kilogram of cocaine to cut into and inspect. (*Id.* at 16) The CD told defendant that he would call him after speaking with "his people" to confirm that they wanted to purchase additional kilograms of cocaine.[8] (*Id.* at 16-17)

8. Hughes then directed the CD to call defendant and order six additional kilograms for $31,000 per kilogram. (*Id.* at 17-18) During this recorded conversation, defendant told the CD that he would contact the sellers and let them know that the CD was interested in purchasing more cocaine. (*Id.* at 18; 61) Defendant informed the CD that someone was on their way to get more cocaine. (*Id.* at 64)

9. Shortly thereafter, Collins[9] observed Martinez leave the residence, enter the Suburban and drive away. (*Id.* at 19, 69) Hughes directed agents to follow the Suburban as it was believed to be en route to retrieve more cocaine from New Jersey. (*Id.* at 19) Law enforcement agents, traveling in unmarked vehicles, followed the Suburban as it crossed over into New Jersey. (*Id.* at 20, 69)

10. For approximately 15 minutes, the agents trailed the Suburban on a rural two-lane highway through southern New Jersey. (*Id.* at 69-70) Concerned the pursuit would be discovered, Hughes ordered the agents to suspend surveillance. (*Id.* at 20, 49)

11. Agents resumed surveillance and pursuit of the Suburban as it returned to

---

[8]The CD and defendant had previously discussed the sale of seven kilograms of cocaine for $31,000 per kilogram for a total price of $217,000. (*Id.* at 17, 64)

[9]He has been a task force officer with the DEA for fifteen years. (*Id.* at 67)

Delaware, about 30 minutes later. (*Id.* at 20, 70) A blue Mazda ("Mazda"),[10] driven by Oscar Gonzalez ("Gonzalez"),[11] was closely following the Suburban. (*Id.* at 24) Each time the Suburban changed lanes, the Mazda followed quickly behind. Both vehicles drove to the residence without making any stops along the way. (*Id.* at 24)

12. The Suburban pulled into the driveway and Martinez entered the residence. (*Id.* at 25, 72) Gonzalez proceeded to drive the Mazda very slowly around the block, several times. (*Id.* at 25) Gonzalez drove past several surveillance vehicles, including one with Hughes inside. (*Id.* at 26) Gonzalez finally stopped about two houses away from the residence and commenced talking on a cell phone. Hughes concluded that Gonzalez was conducting counter-surveillance and had discovered the police presence. (*Id.*) Hughes feared that Gonzalez was talking on the cell phone to people inside the residence, warning them of his discovery. (*Id.* at 25-26) Hughes made a tactical decision and ordered officers to arrest Gonzalez. (*Id.* at 26, 53, 72)

13. As a result, officers (wearing vests displaying "DEA" or "STATE POLICE") quickly converged and surrounded the Mazda. (*Id.* at 26-28) The officers identified themselves and ordered Gonzalez to show his hands. (*Id.* at 27) Hughes pulled Gonzalez out of car and, within seconds, Gonzalez was placed under arrest. (*Id.* at 27) The convergence and arrest created noise that Hughes thought would further alert those inside the residence of police presence. (*Id.* at 55)

---

[10]The Mazda was described a "trail car," which acted as a "rear guard, sentry, the trail car [there] to make sure that nothing happened to the load of cocaine that may have been in the Suburban." (D.I. 27 at 71)

[11](D.I. 22-2)

5

14. From inside the residence, defendant[12] heard the sound of screeching tires and saw people running toward the residence. It was approximately 6 p.m. and dark outside. (*Id.* at 28, 56)

15. Collins and three other agents quickly approached the residence, pursuant to Hughes' order. (*Id.* at 28) Collins was armed with a shotgun and action pump. (*Id.* at 74) As Collins reached three feet from a front, picture window, defendant[13] opened the curtains. (*Id.* at 74) Collins was able to see directly into the residence, as the lights were on in the residence.

16. Collins observed an individual on either side of defendant. (*Id.* at 74) The person to defendant's right fled out of sight toward the kitchen. (*Id.* at 74) The individual on defendant's left, however, reached under a couch cushion before running out of sight. (*Id.* at 75) After about 4 seconds, defendant closed the window curtains.

---

[12]In his affidavit, defendant recounted the events as follows:
> To the best of my knowledge, recollection and belief, the officers did not announce their presence prior to their forcible entry into my home on November 7, 2010. My attention was first drawn to the street by the sound of screeching tires, followed by people running toward the front door, pounding on same. To the best of my knowledge, recollection and belief, I did not advise the officers of the location of any contraband immediately upon their entry into my home, nor did I give consent to search at such time. I was unaware that contraband allegedly seized from within the sofa was located there until I observed one of the codefendants hiding an object in the sofa while the door was being breached. I gave no consent to search until some 20 minutes after the initiation of the raid while I was questioned by the officers. The windows in front of my living room were covered by closed, opaque curtains at the time of the raid, which I parted briefly to look out when I heard the sound of screeching tires as the officers began the raid.

(D.I. 22-1)

[13]Collins recognized defendant from prior investigations. (*Id.* at 75-76)

(*Id.* at 77) A lot of loud noises and movement were heard within the house. (*Id.* at 29 - 30, 77) Collins surmised that defendant saw law enforcement officers and that the investigation was compromised. He called out to warn fellow officers. (*Id.* at 76)

17. In response, Hughes immediately ordered the agents to "take the door." (*Id.* at 76) Hughes inferred that the people inside were arming themselves with firearms and that the officers were in danger.[14] (*Id.* at 30-31) Collins banged on the front door, announced the presence of police and ordered the door opened. (*Id.* at 29, 78) When no one responded, Collins directed a fellow agent to retrieve a ram, which the agents used to force open the door to the residence. (*Id.* at 29, 78) As the door was being breached, defendant saw the individual next to him hide something in the couch. (D.I. 22-1) Police forcibly entered the residence. (*Id.* at 79) Collins ordered defendant, standing in front of the door, to unlock the partially intact storm door. (Id. at 79) Defendant complied and was placed on the ground. (*Id.* at 79)

18. Officers conducted a protective sweep of the residence. They arrested defendant in the threshold area and Martinez was arrested in the living room, directly next to the threshold area. (*Id.* at 31-32) The remaining individuals were arrested in other areas of the residence. (*Id.* at 31-32, 79)

19. Collins suspected that there was a weapon or contraband hidden in the couch. (*Id.* at 79, 82-83) He informed Hughes of what he had witnessed when defendant opened the curtains. (*Id.* at 33, 79, 82-83) Hughes responded and discovered a kilogram of cocaine hidden in the couch cushions. (*Id.* at 32, 79)

---

[14]Hughes was also concerned about the destruction of evidence. (*Id.* at 31)

20. After his arrest, defendant requested that Collins speak with him privately. (*Id.* at 32, 34, 80) Collins took defendant to the rear of the residence. (*Id.* at 34, 80) Hughes provided defendant with his *Miranda* warnings, which defendant waived. (*Id.* at 34-35, 80) Defendant gave Hughes verbal consent to search his residence. (*Id.* at 36)

21. Defendant accompanied Hughes and Collins back inside the residence, and directed them to an upstairs bedroom. (*Id.* at 35) Defendant showed Hughes and Collins a small container that held 28 MDMA/Ecstacy pills, and another 45.8 grams of cocaine. (*Id.* at 35). Defendant then provided Hughes and Collins a written consent to search his residence. (*Id.* at 36; GX3)

22. Collins and Hughes transported defendant from his residence to the DEA resident office in Wilmington, Delaware. (*Id.* at 40) Defendant was again advised of his *Miranda* rights, which he waived in writing. (*Id.* at 40-41; GX4) Hughes and Collins interviewed defendant at 8:24 p.m. (*Id.* at 43; GX5) Defendant admitted that he had planned to broker a seven kilogram cocaine transaction, and that both the buyer and the sellers had agreed to pay him $10,000. (*Id.* at 43)

23. **Standard of Review.** Once a defendant challenges the legality of a warrantless search and seizure, the burden is on the government to demonstrate, by a preponderance of the evidence, that the acts are constitutional. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995); *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005); *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974).

24. The court is charged with reviewing the credibility of witnesses and the weight to be given the evidence, together with the inferences, deductions and

conclusions to be drawn from the evidence. *United States v. McKneely*, 6 F.3d 1447, 1452-53 (10th Cir.1993); *United States v. Williams*, 400 F. Supp.2d 673 (D. Del. 2005).

25. **Discussion.** Defendant contends that officers lacked probable cause and adequate exigent circumstances to justify the warrantless entry of the residence and that the search of the couch exceeded the parameters of a search incident to an arrest and protective sweep doctrines. (D.I. 31) As a result, he contends suppression of the evidence and statements must be suppressed as fruit of the poisonous tree.

26. The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

27. Warrantless searches and seizures inside a person's home are "presumptively unreasonable unless the occupants consent or probable cause and exigent circumstances exist to justify the intrusion." *United States v. Coles*, 437 F.3d 361, 365 (3d Cir. 2006). Probable cause is demonstrated where the facts and circumstances within the law enforcement officer's knowledge are "sufficient to warrant a reasonable person to believe an offense has been committed." *United States v. McGlory*, 968 F.2d 309, 342 (3d Cir. 1992). Direct evidence linking the residence to criminal activity is not required to establish probable cause. *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002). Probable cause can be based on circumstantial

evidence if there is a fair probability that contraband is present at the suspect's residence. *United States v. Whitner*, 219 F.3d 289, 297 (3d Cir. 2000).

28. Exigent circumstances are those situations where "the need for effective law enforcement trumps the right of privacy and the requirements of [a warrant], thereby excusing an otherwise unconstitutional intrusion." *Coles*, 437 F.3d at 366. Examples of exigent circumstances include, but are not limited to, the risk of the destruction of evidence and the threat of physical harm to law enforcement officers. *Id.* The totality of the circumstances must be examined to determine the presence of exigent circumstances.

29. Exigent circumstances fail to satisfy the Fourth Amendment, however, "if the government deliberately creates them." *Id.* Under this "so called 'police-created exigency' doctrine, police may not rely on the need to prevent the destruction of evidence when that exigency was 'created' or manufactured' by the conduct of the police." *Kentucky v. King*, __ U.S. __, __, 131 S.Ct. 1849, 1857 (2011) (citations omitted).

30. Considering this authority in light of the record testimony and evidence, the court concludes that law enforcement officers had probable cause to search defendant's residence. In so doing, the court finds credible the testimony of Hughes and Collins. The record reflects that a past proven reliable CD provided information that defendant was seeking to broker a multi-kilogram cocaine deal on behalf of members of a Mexican drug cartel. This information was confirmed by monitored and recorded telephone conversations between the CD and defendant. The recorded telephone conversations unequivocally demonstrate that the CD and defendant

planned a drug transaction to be consummated at defendant's residence, as they specifically discussed the sellers, prohibited items at the meeting and the amount and price of cocaine. Physical surveillance by undercover law enforcement officers corroborated the information on the telephone calls and the details provided by the CD. The CD went to the residence to inspect the cocaine and, after departing, called defendant to order additional kilograms. Shortly after this call, undercover officers observed the Suburban depart the residence and travel into New Jersey. The officers resumed surveillance as the Suburban and the Mazda trail car returned to Delaware, proceeding directly to the residence. Although Martinez immediately entered the residence, the Mazda drove around the block in an apparent attempt to ascertain whether the area was police-free. This course of events establish that law enforcement officers acted reasonably and had probable cause to conclude that the residence contained drug contraband.

31. Having found probable cause, the issue becomes whether the record establishes that exigent circumstances were present to support the warrantless, forcible entry into the residence. In finding that exigent circumstances warranted the entry of the residence, the court recognizes that the events unfolded very rapidly, increasing an already precarious undercover investigation. This fluid chain of events began when Hughes surmised that Gonzalez had discovered the police presence and was warning the people inside the house, ostensibly, to destroy evidence and/or arm themselves. The decision to arrest Gonzalez further heightened the danger through the noise and attention drawn to the area. In fact, defendant averred that the sounds of screeching tires drew him to the window to open the curtains and that he saw people running

toward the residence. During those split seconds that the curtains were open, Collins, at very close proximity, observed an individual place something in the couch before the curtains were quickly closed. Defendant's own affidavit corroborates the observation. Further, while standing in front of the residence, Hughes heard loud noises and movement coming from inside. With officers stationed in vulnerable positions, Hughes made the decision to forcibly enter the residence to protect themselves and prevent the destruction of evidence.

32. The record does not support defendant's contention that officers created the exigency. Rather, the quickly unfolding events satisfactory demonstrate that officers acted reasonably. There was nothing of record to suggest that officers' conduct caused or manipulated the events to create the need to forcibly enter the residence.

33. With respect to the search of the couch, it is well-settled that a search incident to a lawful arrest is an exception to the warrant requirement of the Fourth Amendment. *United States v. Shakir*, 616 F.3d 315, 317 (3d Cir. 2010) . Searches incident to arrest are permitted to "disarm a suspect in order to take him into custody," and to preserve evidence for later use at trial." *Knowles v. Iowa*, 525 U.S. 113, 116 (1998). The permissible scope of the search includes "the arrestee's person and the area 'within his immediate control'- construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Shakir*, 616 F.3d at 321 (3d Cir. 2010); *United States v. Myers*, 308 F.3d 251, 267 (3d Cir. 2002).

34. The Third Circuit recently held that the fact that an arrestee is handcuffed at the time of the search does not automatically mean that he would be unable to access

a weapon or destroy evidence. *Shakir*, 616 F.3d at 320-321. Instead, the totality of the circumstances must be evaluated to determine whether

> there remains a reasonable possibility that the arrestee could access a weapon or destructible evidence in the container or area being searched. Although this standard requires something more than the mere theoretical possibility that a suspect might access a weapon or evidence, it remains a lenient standard.

*Id.* at 321.

35. In light of this authority, the court concludes that the search conducted incident to defendant's arrest was reasonable. Significantly, there was credible eye witness testimony by Collins that something was placed in the couch cushions. Although he was unable to see what was placed because defendant quickly closed the curtains, presumably to hide from sight what was occurring in the residence, Collins believed that a weapon may have been placed there. Defendant was arrested, and remained standing, near the couch when Hughes approached and spoke with Collins. Coupling this observation with the knowledge of the violence and danger inherent in drug transactions involving multiple kilograms of cocaine and members of a Mexican drug cartel, it was reasonable for Hughes to search the couch. Moreover, the search was limited to the couch cushions and went no further than necessary to ensure officer safety and ensure that no evidence was destroyed.

36. Similarly, the court finds that defendant's contention that the search exceeded the scope of the protective sweep doctrine is unavailing. The Supreme Court has observed that "an in home arrest puts the officer at the disadvantage of being on his adversary's 'turf.'" *Maryland v. Buie,* 494 U.S. 325, 330 (1990) (citation omitted). To that end, "the protective sweep doctrine allows 'a quick and limited search of premises,

incident to an arrest and conducted to protect the safety of police officers and others." "
*United States v. Foley*, 218 Fed. Appx. 139, 143 (3d Cir. 2007). As noted, the search was necessary to the officers and prevent the destruction of evidence.

37. **Conclusion**. Based on the court's findings that there were no Fourth Amendment violations, it is unnecessary to address defendant's remaining argument that the evidence and statements should be suppressed as fruit of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (Evidence obtained pursuant to a warrantless search that does not meet an exception to the warrant requirement must be suppressed as "fruit of the poisonous tree.").

IT IS FURTHER ORDERED that:

1. A telephone status conference is scheduled to commence on **Tuesday, March 20, 2018 at 4:00 p.m.**, with the court initiating said call.

2. The time between this order and the teleconference shall be excludable under the Speedy Trial Act in the interests of justice, 18 U.S.C. § 3161, et seq.

United States District Judge