IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Crim. No. 11-55-SLR |
| ) | |
| WILLIAM BONEY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM ORDER**

At Wilmington this 8th day of May, 2013, having considered defendant's motion for judgment of acquittal and the papers submitted in connection therewith;

IT IS ORDERED that said motion (D.I. 96) is denied for the reasons that follow:

1. **Introduction.** On January 29, 2013, following a six-day trial, a jury found defendant William Boney guilty on counts one, two and four and not guilty on count three of a superseding indictment.[1] Before the court is defendant's motion for judgment

---

[1] On May 24, 2011, a federal grand jury returned an indictment charging defendant with one count of conspiracy to possess with intent to distribute five hundred grams or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(B). (D.I. 3) Defendant entered a plea of not guilty to the charge. (D.I. 11) On April 12, 2012, a federal grand jury returned a superseding indictment charging defendant with: (1) conspiracy to possess with intent to distribute five hundred grams or more of cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B); (2) attempted obstruction of justice by retaliating against an informant, in violation of 18 U.S.C. § 1513(a)(1)(B); (3) obstruction of justice, in violation of 18 U.S.C. § 1503(a); and (4) solicitation of obstruction of justice by retaliating against a witness/informant, in violation of 18 U.S.C. §§ 1513(a)(1)(B) and 373. (D.I. 37) Defendant entered a plea of not guilty to the charges. (D.I. 39)

of acquittal pursuant to Fed. R. Crim. P. 29[2] and motion for new trial pursuant to Fed. R. Crim. P. 33.[3] Plaintiff has filed opposition to the motion, to which defendant has filed a reply. (D.I. 96, 100, 107) The court has jurisdiction pursuant to 18 U.S.C. § 3231.

2. **Standard of Review.** Federal Rule of Criminal Procedure 29 provides that a defendant may make a motion for judgment of acquittal, based on insufficiency of evidence to sustain a conviction, "after the government closes its evidence," "after the close of all the evidence" or "after a jury verdict." Fed. R. Crim. P. 29(a), (c)(1). If the court reserves decision on said motion, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." Rule 29(b).

3. In ruling on a motion for judgment of acquittal, the court must "view the evidence in the light most favorable to the verdict, and must presume that the jury has properly carried out its functions of evaluating credibility of witnesses, finding the facts, and drawing justifiable inferences." *United States v. Lacy*, 446 F.3d 448, 451 (3d Cir. 2006). Courts must be "vigilant not to usurp the role of the jury by weighing credibility and assigning weight to the evidence or by substituting its judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). The defendant bears a "very heavy burden" when challenging the sufficiency of the evidence supporting a jury verdict. *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995). A "finding of

---

[2] At the close of plaintiff's case, defendant orally moved for judgment of acquittal under Rule 29(a) as to counts two, three and four, which plaintiff opposed. (D.I. 104 at 636-37) The court denied the motion as to count four, but reserved judgment on counts two and three. (*Id.* at 639) Following the jury's verdict, defendant filed a motion for judgment of acquittal on counts one, two and four. (D.I. 96)

[3] Defendant moves for new trial on counts one, two and four. (D.I. 96)

insufficiency should 'be confined to cases where the prosecution's failure is clear.'" *United States v. Smith,* 294 F.3d 473, 477 (3d Cir. 2002) (quoting *United States v. Leon,* 739 F.2d 885, 891 (3d Cir. 1984)).

4. Federal Rule of Criminal Procedure 33 allows a court, upon motion of a defendant, to grant a new trial if mandated by the interest of justice. *United States v. Brennan,* 326 F.3d 176, 189 (3d Cir. 2003). A court may order a new trial where the jury's verdict is contrary to the weight of the evidence only if the court believes that there is a serious danger of a miscarriage of justice, that is, an innocent person has been convicted. *United States v. Johnson,* 302 F.3d 139, 150 (3d Cir. 2002). In reviewing a Rule 33 motion, the court exercises its own judgment in assessing the case against the defendant, and the decision to grant a new trial is vested within the court's sound discretion. *Id.*

5. **Count one.** Defendant asserts that there was insufficient evidence for the jury to find that he was predisposed to entering the drug conspiracy prior to being first approached by P.H.,[4] a government informant. (D.I. 96) While not denying that he engaged in the cocaine conspiracy, defendant avers that P.H. repeatedly solicited and pressured him for assistance in finding a cocaine supplier and even offered $30,000 for

---

[4]P.H. was arrested by the Drug Enforcement Administration ("DEA") on May 19, 2010 and released shortly thereafter to begin working in an undercover capacity as a cooperating defendant with Special Agent David Hughes, a fourteen-year veteran with the DEA. (D.I. 102 at 155, 283-84) Before participating in the investigation related to the charges at bar, P.H. worked with Hughes on several other drug investigations. (*Id.* at 157, 284, 293) At defendant's trial, P.H. testified as a government witness. He was incarcerated, having pled guilty, and was awaiting sentencing. (*Id.* at 288)

3

the introduction, as an incentive. (D.I. 107) Defendant further maintains that the government did not prove, beyond a reasonable doubt, that defendant was not entrapped.

6. Entrapment is a limited defense that is applicable only where the government's deception actually implants the criminal design into the mind of the defendant. *United States v. Russell*, 411 U.S. 423, 436 (1973). A "valid entrapment defense has two related elements: (1) government inducement of the crime; and (2) a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Matthews v. United States*, 485 U.S. 58, 63 (1988). The defendant bears the burden of producing evidence of both inducement and absence of predisposition to commit the crime. *United States v. Fedroff*, 874 F.2d 178, 182 (3d Cir. 1989); *United States v. Wright*, 921 F.2d 42, 44 (3d Cir.1990). After the defendant has demonstrated this showing, it is the government's burden of proving, beyond a reasonable doubt, that it did not entrap the defendant. *Wright*, 921 F.2d at 44.

7. "Government inducement" is more than providing the "opportunity to commit a crime," such as conducting a sting. *Jacobson v. United States,* 503 U.S. 540, 550 (1992). Rather, it requires improper conduct by the government, such as the use of intimidation or threats, coercive tactics, dogged insistence or demands based on need, sympathy or friendship. *Fedroff*, 874 F.2d at 185.

8. With respect to the second element, lack of predisposition, the focus is on the existence of a similar course of criminal conduct in the past, an "already formed design" to commit the crime, or "a willingness to commit the crime as evidenced by a ready

4

response" to the government's inducement. *Id.* at 183. Predisposition may also be demonstrated by the character, reputation or prior criminal record of defendant. *United States v. Lakhani*, 480 F.3d 171, 179 (3d Cir. 2007). "Evidence concerning predisposition is not undisputed if the determination depends upon the credibility of witnesses or the interpretation of the evidence." *United States v. Gambino*, 788 F.2d 938, 944 (3d Cir. 1986).

9. Viewed in the light most favorable to the government, the court concludes that there was sufficient evidence presented at trial for a reasonable jury to find that the government did not entrap defendant. Specifically, P.H. testified that he was defendant's drug dealer and that he regularly sold cocaine[5] to defendant between the summer of 2004 and May 2010, about two times a month.[6] (D.I. 102 at 291-92) In May 2010, after P.H. had commenced cooperating for law enforcement, defendant made repeated telephone calls to P.H. seeking to purchase cocaine. (*Id.* at 293-94) Consistent with Agent Hughes' instructions, P.H. informed defendant that he did not have any cocaine and was awaiting a shipment. (*Id.* at 293-94)

10. By the summer 2010, defendant proposed the idea of introducing P.H. to new sources of cocaine. (*Id.* at 294-96) P.H. was interested in this offer and told defendant that he was willing to pay $30,000 as a broker's fee for an introduction to a new source. (*Id.* at 295-296) A few weeks prior to November 7, 2010, defendant informed P.H. that he had two sources for cocaine, one located in Delaware and the

---

[5] In quantities ranging from 4 1/2 ounces to half-kilograms of cocaine. (*Id.* at 292)

[6] At some prior time, defendant and P.H. were incarcerated at the same prison and were friends. (GX12; D.I. 105 at 811)

other in New Jersey.[7]  (*Id.* at 301-302)  P.H. countered with a new offer for defendant, $10,000 per cocaine transaction, instead of the $30,000 one-time introduction fee.  (*Id.* at 300-01)  The $10,000 broker's fee offered by P.H. was a typical amount for transactions involving that quantity of cocaine.  (D.I. 103 at 364-65)  P.H. said he wanted to purchase between five to ten kilograms of cocaine.  (D.I. 102 at 300)  After several conversations, defendant and P.H. agreed that the transaction would occur on November 6, 2010.[8]  (*Id.* at 303)  On November 7, 2010, defendant and three co-conspirators were arrested.[9]

---

[7]The Delaware suppliers were located south of Dover, Delaware.  (*Id.* at 302)  The New Jersey suppliers were part of a Mexican drug cartel.  Defendant had previously purchased marijuana from these Mexican suppliers.

[8]Because of various delays, the drug transaction actually occurred the following day, November 7, 2010.  (*Id.* at 303)  During the delays, P.H. had a series of telephone conversations with defendant.  Six of these conversations were recorded under the supervision of Special Agent Hughes.  The government played audio recordings and provided transcripts of the conversations for the jury of the calls between P.H. and defendant.  (GX1, Gx2)  During these conversations, defendant discussed: (1) the location and details of the cocaine transaction; (2) the quality of the product; (3) counter-surveillance measures that the suppliers would use; (4) identity of the supplier (Mexican cartel); and (5) potential for ongoing relationship with Mexican supplier and Delaware supplier.  (*Id;* D.I. 102 at 158-59)  The government also introduced phone records reflecting numerous calls made by defendant to a co-conspirator on November 6-7.  (GX36)

[9]Immediately following his arrest, defendant informed law enforcement officers that he wanted to give a statement in private, away from his co-conspirators.  (D.I. 102 at 199-204)  Defendant was given verbal and written Miranda warnings, which he waived.  (*Id.* at 206-07)  Special Agent Hughes interviewed defendant.  The statement was recorded and played at trial for the jury.  (*Id.* at 209; GX9, GX10)  During the interview, defendant admitted his role in the drug conspiracy, but claimed that P.H. had pressured him to make the deal.  Defendant explained that the broker's fee would enable him to take a month off from working.  (GX9)  After the statement, Special Agent Hughes concluded that defendant might be helpful in obtaining information about additional members of the Mexican cartel.  (*Id.* at 223)  As a result, defendant was released from custody in order to begin cooperating with the DEA.  (*Id.* at 222-23, 239)

6

11. The court further finds that the broker's fee did not induce defendant into engaging in the conspiracy because there was sufficient evidence for the jury to find that the defendant was predisposed to committing the offense. There was undisputed evidence presented that defendant had a prior conviction for trafficking large quantities of marijuana.[10] There was trial testimony that defendant had a history of purchasing cocaine from P.H. When P.H. was unable to meet defendant's repeated requests for cocaine, defendant located two other sources of cocaine and offered to introduce P.H. to those suppliers. The broker's fee was offered after defendant proposed the two sources and there was no evidence presented demonstrating that the fee was the reason defendant negotiated the deal. Also, the amount of the broker's fee was not out of the ordinary for drug transactions of the quantity at bar.

12. The recorded conversations demonstrated to the jury that defendant had a keen knowledge of the nuances of drug trafficking and further buttressed the government's theory that defendant was predisposed to commit the offense. For example, defendant initiated seven of the eight telephone calls to P.H. and defendant made approximately thirty other telephone calls with the co-conspirators while attempting to arrange the drug transaction. During these conversations, the jury heard defendant discuss, among other things, the manner and necessity of testing the cocaine, the preferences of the Mexican cartel suppliers, the way the payment would be

---

Defendant's conduct, during the period of his cooperation with DEA, forms the basis of the charges in counts two, three and four.

[10]The parties stipulated that defendant was convicted on January 28, 2002 of trafficking between five to one hundred pounds of marijuana. (GX28)

7

made and the counter-surveillance techniques used by the Mexican cartel to avoid discovery by law enforcement.

13. **Count two**. Count two required the government to prove that defendant knowingly or intentionally performed an act that constituted a "substantial step" towards the murder of a government informant.[11] *United States v. Cruz-Jiminez*, 977 F.2d 95, 102 & n.10 (3d Cir. 1992); *United States v. Earp*, 84 Fed. Appx. 228, 233 (3d Cir. 2004). The United States Court of Appeals for the Third Circuit follows the Model Penal Code in determining what the government is required to prove for a crime of attempt. *Earp*, 84 Fed. Appx. at 233. To that end,

> A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he purposefully does or omits to do anything that, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

*Cruz-Jiminez*, 977 F.2d at 102.

14. At trial, the government established that, during the period[12] that defendant was cooperating with the government, he discovered that P.H. had been working in an undercover capacity for the DEA and was, ostensibly, responsible for setting defendant up with the seven kilos of cocaine. (GX12) Consequently, defendant attempted to locate a person willing to commit the murder of P.H., for a price. He was also willing to

---

[11]P.H.

[12]Defendant was cooperating with the DEA from November 2010 to May 2011. (D.I. 102 at 239-40; 247-49. During this period of time, he was admonished that he was not permitted to act as an agent for the government without first receiving explicit approval from the DEA. (*Id.* at 240-50)

8

pay someone to kill P.H.'s infant child. (*Id.*) Unbeknownst to defendant, the individuals[13] solicited to commit the murder(s) were cooperating with law enforcement.

15. Defendant contends that, because he did not provide I.G. with P.H.'s last name or address, the jury could not have found that he took a "substantial step" toward the murder. (D.I. 96, 107) Without this critical information, defendant avers it would have been impossible for the hit man to have killed P.H. and, therefore, the jury could not have found him guilty of count two.

16. The evidence[14] adduced at trial by the government reflected that defendant took substantial steps toward the commission of the murder of P.H. by: (1) asking Gene if he could hire a "hit man" to kill P.H.; (2) meeting with I.G. three times to discuss the plot; (3) providing I.G. with a detailed description of P.H.; (4) showing I.G. a facebook photograph of P.H. and providing a photo and first name of P.H.; (5) detailing P.H.'s drug dealing activities; (6) providing I.G. with information about P.H.'s warehouse in Smyrna, Delaware; (7) telling I.G. about P.H.'s motorcycle (worth $110,000) and unique tractor trailer; (8) describing P.H.'s unique tattoos; (9) negotiating a specific

---

[13]Two cooperating defendants, I.G. and T.K., informed the DEA that an individual named Gene had been approached by defendant for the purpose of finding a hit man to murder P.H. (D.I. 103 at 381-82) As a result, Special Agent Hughes decided to have I.G. pose as a potential hit man. (*Id.* at 383-387) DEA agents equipped I.G. with a hidden recorder and transmitter to record his meetings with defendant. (*Id.* at 388-89) One such conversation was played for the jury. (GX12)

[14]Considering that defendant moved for judgment of acquittal on this count at the close of the government's case and the court reserved decision thereon, the record under review does not include the evidence presented by defendant or on rebuttal by the government. Fed. R. Crim. P. 29.

payment agreement;[15] (10) driving I.G. to the homes of proposed robbery targets; (11) giving I.G. detailed information about the robbery targets; and (12) providing I.G. with additional names, addresses and photographs of robbery targets, after it appeared the earlier specified targets had not been robbed.

17. Significantly, because the government played the taped conversations between defendant and I.G., the jury heard and was able to assess defendant's demeanor as he clearly expressed the reasons for wanting P.H. dead, as well as the steps defendant took to set the plot in motion. Furthermore, even when considering the entire record for purposes of defendant's post-trial motion for judgment of acquittal, the court finds there was sufficient evidence for a reasonable jury to find that defendant's plot had progressed beyond mere solicitation.

18. When considering defendant's post-trial R. 29 motion, the court's reasoning is further buttressed by defendant's own testimony that he wanted to ensure that the plot had progressed to the point where it was ready to go and where Special Agent Hughes would have to intervene to stop it.[16] (D.I. 104 at 689) Despite this statement,

---

[15]During the taped conversations played for the jury, I.G. told defendant that the murder of P.H. would cost $8,000, and it would be $25,000 for the murder of a child. (GX12) I.G. stated that some of the money would be due before the murder(s) and the remainder payable after the act was completed. Rather than paying I.G. cash, defendant proposed paying I.G. with robbery proceeds. Specifically, defendant told I.G. about debts owed him by certain individuals and where those individuals stored their funds. Defendant showed I.G. where these debt-owing individuals lived.

[16]Essentially, defendant averred that the conversations and plotting with I.G. about murdering P.H. were actually a case he was creating as part of his cooperation for the DEA. (D.I. 104 at 689) Defendant wanted to present Special Agnet Hughes "something significant" such as removing a murderer from the street, which would help "knock off" time from defendant's sentence.

defendant did not tell Special Agent Hughes or any law enforcement officer about the plot. (D.I. 105 at 820)

19. **Count four.**[17] Defendant argues that the absence of the target's last name and address demonstrate that his actions did not "strongly indicate that he intended the other person to commit the crime of killing with the intent to retaliate." (D.I. 96 at 5-6) He further asserts that it is impossible to "solicit someone to kill another while withholding the identity of the target." (D.I. 107 at 6)

20. The Third Circuit has concluded that "to establish the crime of solicitation the government must prove by 'strongly corroborative circumstances' that the defendant had the intent that another person engage in conduct constituting a crime described in Title 18, and that the defendant actually commanded, induced or otherwise endeavored to persuade the other person to commit the felony." *United States v. McNeill*, 887 F.2d 448, 450 (3d Cir. 1989) (internal citation omitted). "The phrase 'otherwise endeavors to persuade' is designed to cover any situation where a person seriously seeks to persuade another person to engage in criminal conduct." *Id.*, (quoting S.Rep. No. 97-307, 97th Cong. 1st Sess. 183-84 (1982)). The existence of "strongly corroborative circumstances" is a question of fact for the jury. *Id.* Inferences made from established facts are accepted methods of proof where there is no direct evidence available as long as there is a logical and convincing connection between the facts established and the conclusion inferred. *United States v. Bycer*, 593 F.2d 549, 550 (3d Cir.1979).

---

[17]Essentially, count four charges defendant with solicitation to commit murder of P.H.

11

21. Weighing the evidence in the light most favorable to the government, the court finds that there was sufficient evidence from which a reasonable jury could find defendant guilty of solicitation to commit murder. Significantly, defendant's three meeting with I.G., during which defendant strongly stated his intention to have P.H. and/or his child killed, constitute sufficient evidence of solicitation. (GX12) The jury clearly heard defendant's tone and serious demeanor when discussing P.H. and the proposed murder(s). Defendant's intent was further revealed during these meetings, where he: (1) proposed a detailed payment plan involving robbery and collection of debts; (2) showed I.G. a Facebook photo of P.H. and gave specific identifying details; and (3) took I.G. to the homes to be robbed as payments for the murder.

22. With respect to defendant's contention that the jury's verdict on counts one, two and four is contrary to the weight of the evidence, the court disagrees and finds that the interests of justice do not mandate a new trial under Fed. R. Crim. P. 33.

_____
United States District Judge