# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,

                Plaintiff,

         v.

WILLIAM BONEY,

               Defendant.

Criminal No. 11-55-CFC

---

David C. Weiss, United States Attorney, Edmond Falgowski, Assistant United States Attorney, The United States Attorney's Office for the District of Delaware, Wilmington, Delaware.

     *Counsel for Plaintiff*

William Boney, Federal Correction Institution, Jesup, Georgia.

     *Pro Se Defendant.*

## **MEMORANDUM OPINION**

December 16, 2020
Wilmington, Delaware

COLM F. CONNOLLY
UNITED STATES DISTRICT JUDGE

Defendant William Boney has filed a motion *pro se* for a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) based on his health conditions (asthma and Achalasia) in light of the COVID-19 pandemic and his purported rehabilitation since being incarcerated. (D.I. 200). For the reasons stated below, the Court will deny the motion.

## I.   BACKGROUND

### A. Defendant's Conviction

Boney was convicted by a jury of one count of conspiring to distribute 500 grams or more of cocaine, one count of attempting to kill a government informant, and one count of solicitation to kill a government informant. D.I. 204 at 2. The drug charge arose from Boney's agreement to broker a multi-kilogram cocaine transaction between Philip Haines and a large-scale drug trafficker from New Jersey. *Id*. Unbeknownst to Boney, Haines was working as a confidential informant with the Drug Enforcement Administration (DEA).

After Boney's arrest, he agreed to cooperate with the DEA. *Id*. His cooperation efforts, however, "turned sour." *Id*. As a result, the government began to take steps to prosecute Boney for his role in the cocaine transaction. *Id*.

1

at 3.  But before the government indicted Boney, the DEA learned that he was attempting to hire a hit man to murder Haines.  *Id.*  at 3.

In May 2011, Boney met with Ishmael Garrett—also a cooperator working with the DEA—and agreed to pay Garrett $8,000 to murder Haines.  *Id.*  In the course of their discussions, Boney told Garrett that, if it was not possible to kill Haines, he wanted Garrett to kill Haines's newborn child.  *Id.*  Boney met with Garrett again in June and July 2011. *Id.*  Boney showed Garrett pictures of Haines, provided identifying details about Haines, and discussed payment, including giving the names and locations of individuals who owed Boney money so that Garrett could either collect payment directly or rob others to obtain payment.  *Id.*

A jury convicted Boney of conspiring to distribute cocaine, attempting to kill a government informant, and solicitation of the attempted murder of a government informant.  *Id.*  On appeal, the Third Circuit affirmed Boney's convictions, but concluded that the District Court had erred in calculating the appropriate Guideline range and remanded for resentencing.  *United States v. Boney*, 634 F. App'x 894, 897 (3d. Cir. 2015).  On remand, the District Court sentenced Boney to 272 months of imprisonment, which represented a significant downward variance from the applicable Guidelines range of 324 to 425 months.  D.I. 204 at 3.

As of October 2020, Boney has served 111 months of his sentence. D.I. 204 at 4. His anticipated release date is December 7, 2030, approximately 10 years from now. *Id.* He has therefore served less than half of his sentence.

## B. Defendant's Health

Boney is 47 years old. D.I. 201 Ex. A. On May 21, 2020, Boney submitted a request for a sentence reduction to the Warden of FCI-Jesup based on the COVID-19 pandemic. D.I. 201 Ex. D. In his request, Boney argued that two of his medical conditions, achalasia and asthma, placed him in a high-risk category with respect to a potential COVID-19 exposure. *Id.* Achalasia is a "swallowing disorder that affects the esophagus" and makes it "harder to swallow food and drinks." D.I. 204 at 13 (quoting https://www.cedars-sinai.org/health-library/diseases-and- conditions/a/achalasia.html). The Warden denied Boney's request, noting that he was classified as "care level 2" with no medical restrictions. D.I. 201 Ex. D.

Pursuant to BOP Clinical Guidance, inmates are assigned to one of four possible care levels.[1] "Care Level 1 inmates are less than 70 years of age and are generally healthy." *Id.* at 2. "Care Level 2 inmates are stable outpatients" with medical conditions that can be "managed through routine, regularly scheduled appointments with clinicians for monitoring." *Id.* Care Level 3 inmates are

---

[1] https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf.

"outpatients who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications." *Id.* at 3. In addition, Care Level 3 inmates "may require assistance with some activities of daily living (ADLs) that can be accomplished by inmate companions." *Id.* For Care Level 4 inmates, "[f]unctioning may be so severely impaired as to require 24-hour skilled nursing care or nursing assistance." *Id.*

### C. COVID-19 and Facility Conditions

COVID-19 is a newly emergent infectious disease that as of March 11, 2020 was declared by the World Health Organization to be a pandemic.[2] The Center for Disease Control (CDC) divides the severity of illness from COVID-19 into three categories: "mild to moderate," "severe," and "critical."[3] Mild to moderate cases can include fever, cough, and shortness of breath. *Id.* Severe cases include dyspnea and hypoxia. *Id.* Critical cases include respiratory failure and multiorgan system dysfunction. *Id.*

---

[2] https://www.who.int/news/item/29-06-2020-covidtimeline.

[3] https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html

COVID-19 spreads "mainly through exposure to respiratory droplets when a person is in close contact with someone who has COVID-19."[4]

Boney is presently incarcerated at the Federal Correctional Institute-Jesup (FCI Jesup), which houses approximately 1,335 inmates.[5]  According to Boney, at the time he filed his motion on August 31, 2020, the Bureau of Prisons (BOP) website reporting coronavirus statistics stated that there were 8 inmate positive cases, 19 staff positive cases, 1 inmate death, 0 staff deaths, 258 prisoners recovered, and 7 staff recovered.  D.I. 200 at 3 (citing https://www.bop.gov/coronavirus/).  The Government described several "significant measures" the BOP has taken to "mitigate sharply the risks of COVID-19 transmission in a BOP institution."  D.I. 204 at 4-7.

## II.  DISCUSSION

In general, a district court cannot modify a term of imprisonment once it has been imposed unless a defendant is eligible for a reduction of sentence pursuant to 18 U.S.C. § 3582(c).  *United States v. Mainor*, 725 F. App'x 85, 86 (3d Cir. 2018).  Section 3582 was amended in 2018 as part of the First Step Act.[6]  Before the

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

[5] https://www.bop.gov/locations/institutions/jes/.

[6] The First Step Act (P.L. 115-391) was signed into law on December 21, 2018. The act has three major components: (1) correctional reform via the establishment

enactment of the First Step Act, only the Director of the Bureau of Prisons could file a motion seeking a sentence reduction, sometimes also called "compassionate release." Now a motion may be filed by either the Director of the Bureau of Prisons or the defendant, except the defendant may not file a motion until "after [he or she] has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Here, Boney has filed the motion on his own behalf, and the Government concedes that Boney has met the exhaustion requirement. D.I. 204 at 11 n. 9.

Although the First Step Act changed the process by which inmates can request a reduced sentence, it did not alter the statutory standards that must be met for that request to be granted. The Sentencing Reform Act of 1984 established the statutory standard for reducing a sentence. Under that statute, a Court may reduce the term of imprisonment if it finds that "extraordinary and compelling reasons warrant such a reduction," and "such a reduction is consistent with applicable

---

of a risk and needs assessment system at the Bureau of Prisons, (2) sentencing reform via changes to penalties for some federal offenses, and (3) the reauthorization of the Second Chance Act of 2007 (P.L. 110-199). https://fas.org/sgp/crs/misc/R45558.pdf. The amendment to § 3582 can be found in Title VI, which is titled "Miscellaneous Criminal Justice" provisions. https://uscode.house.gov/statutes/pl/115/391.pdf.

policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Reform Act did not define what constitutes "extraordinary and compelling reasons," instead directing the Sentencing Commission to promulgate policy statements that do so. 28 U.S.C. §§ 994(a)(2)(C) and (t).

The policy statement of the Sentencing Commission that governs sentence reduction can be found at U.S.S.G. § 1B1.13. Under that policy statement, a defendant is eligible for a sentence reduction if, after considering the factors set forth in 18 U.S.C. § 3553(a), the court determines that three criteria are satisfied: (1) "extraordinary and compelling reasons warrant the reduction"; (2) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (3) "the reduction is consistent with this policy statement." U.S. Sentencing Guidelines Manual § 1B1.13 (U.S. Sentencing Comm'n 2018).

## A. Extraordinary and Compelling Reasons

U.S.S.G. § 1B1.13 was first issued in November 2006 and its "Application Notes" section has been amended substantively at least three times since then. The Application Notes contain four categories of extraordinary and compelling reasons.: "Medical Condition of the Defendant," "Age of the Defendant," "Family

Circumstances," and "Other Reasons."  U.S. Sentencing Guidelines Manual §

1B1.13 cmt. 1 (U.S. Sentencing Comm'n 2018).

Only the "Medical Condition of the Defendant" is potentially applicable

here.  The "Age of the Defendant" requires Boney to be at least 65 years old,

which he is not.  *Id.* at cmt. 1(B).  "Family Circumstances" requires the death or

incapacitation of either: (1) the caregiver of the defendant's minor children or (2)

the defendant's spouse or registered partner, neither or which Boney alleges.  *Id.* at

cmt. 1(C).  Finally, the catchall "Other Reasons" requires a determination by the

Director of the Bureau of Prisons that "there exists in the defendant's case an

extraordinary and compelling reason other than, or in combination with," the

reasons already identified.  *Id.*  at cmt. 1(D).  Because this motion was filed by

Boney on his own behalf and not by the Bureau of Prisons, the Director has made

no such determination, so the catchall provision does not apply here.

The Application Notes divide the "Medical Condition of the Defendant" into

two subcategories: terminal illness and non-terminal illness.  Specifically, they

state that the medical condition of the defendant constitutes an extraordinary and

compelling reason if:

> (i) The defendant is suffering from a terminal illness (i.e., a serious
> and advanced illness with an end of life trajectory). A specific
> prognosis of life expectancy (i.e., a probability of death within a
> specific time period) is not required. Examples include metastatic
> solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage
> organ disease, and advanced dementia. [or]

8

(ii) The defendant is—

    (I) suffering from a serious physical or medical condition,

    (II) suffering from a serious functional or cognitive impairment, or

    (III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S. Sentencing Guidelines Manual § 1B1.13 cmt. 1(A) (U.S. Sentencing Comm'n 2018)..

To understand the Application Notes, it helps to consider the reasons the Sentencing Commission gave for their last substantive amendment in 2016. Before 2016, the Application Notes required a "terminal illness" with no elaboration. Amend. 799 to U.S. Sentencing Guidelines Manual § 1B1.13. 1 (U.S. Sentencing Comm'n 2016), available at https://guidelines.ussc.gov/ac/799. Now, however, the Application Notes define "terminal illness" as "a serious and advanced illness with an end of life trajectory," and they explain that a probability of death within a specific time period "is not required." *See* U.S. Sentencing Guidelines Manual § 1B1.13 cmt. 1 (U.S. Sentencing Comm'n 2018).. As the Sentencing Commission explained, these changes were made after reviewing the Bureau of Prisons' internal criteria for implementing § 3582(c)(1)(A) and hearing

testimony and public comment on the challenges associated with diagnosing

terminal illness.[7] Specifically, the Sentencing Commission stated:

> [W]hile an end-of-life trajectory may be determined by medical
> professionals with some certainty, it is extremely difficult to
> determine death within a specific time period. For that reason, the
> Commission concluded that requiring a specified prognosis (such as
> the 18-month prognosis in the Bureau of Prisons' program statement)
> is unnecessarily restrictive both in terms of the administrative review
> and the scope of eligibility for compassionate release applications.
> For added clarity, the amendment also provides a non-exhaustive list
> of illnesses that may qualify as a terminal illness.

Amend. 799 to U.S. Sentencing Guidelines Manual § 1B1.13. 1 (U.S. Sentencing

Comm'n 2016).

For non-terminal illnesses, the Sentencing Commission explained:

> [T]he amendment provides three broad criteria to include defendants
> who are (i) suffering from a serious condition, (ii) suffering from a
> serious functional or cognitive impairment, or (iii) experiencing
> deteriorating health because of the aging process, for whom the
> medical condition substantially diminishes the defendant's ability to
> provide self-care within a correctional facility and from which he or
> she is not expected to recover. The primary change to this category
> is the addition of prong (II) regarding a serious functional or
> cognitive impairment. This additional prong is intended to include a
> wide variety of permanent, serious impairments and disabilities,

---

[7] In the Sentencing Commission's February 17, 2016 Public Hearing on
Compassionate Release, Dr. Brie Williams, Associate Professor of Medicine,
Division of Geriatrics, University of California, San Francisco testified about the
difficulty doctors have of predicting an exact time period until death for a terminal
illness. *Public Hearing on Compassionate Release & Conditions of Supervision*,
United States Sentencing Comm'n, at 154-162 (Feb. 17, 2016); Transcript
available at https://www.ussc.gov/sites/default/files/Transcript_6.pdf.

whether functional or cognitive, that make life in prison overly difficult for certain inmates.

Amend. 799 to U.S. Sentencing Guidelines Manual § 1B1.13. 1 (U.S. Sentencing Comm'n 2016).

In his motion, Boney does not claim that he is currently diagnosed with a terminal illness or a "serious" non-terminal illness that "substantially diminishes" his ability to provide self-care, as required by Sentencing Commission's policy statement. Instead, Boney contends that his achalasia and asthma in combination with the COVID-19 pandemic create a high risk that he will develop a serious or terminal illness should he contract the virus. The issue is whether this reason satisfies or is consistent with the extraordinary and compelling standard laid out in U.S.S.G. § 1B1.13.

As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Roeder*, 803 F. App'x 157 n.16 (3d Cir. 2020) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit.").

The Government does not dispute the relevance of COVID-19 to the resolution of Boney's motion.  In the Government's view, it is appropriate to consider: (1) whether a defendant's underlying medical conditions increase his risk of becoming "seriously ill from COVID-19," and (2) whether the defendant is more likely to contract COVID-19 is he is released compared to if he remains incarcerated.  D.I. 204 at 11-12.  This seems like a sensible way to apply § 1B1.13 to the unusual circumstances created by COVID-19.

Applying the standards set out in U.S.S.G. § 1B1.13, the Court finds that Boney's achalasia and asthma fall short of showing a risk of becoming "seriously ill" from COVID-19.  The CDC has identified several underlying medical conditions that may put adults of any age at increased risk for severe illness from the virus that causes COVID-19.[8]  Achalasia is not one of them.  *Id.*  In addition, the CDC describes as "mixed" the evidence that asthma presents an increased risk of Covd.  *Id.*  Finally, Boney's medical conditions appear relatively minor and effectively controlled with medication.

Boney did not provide any information regarding where he would go or with whom he would reside if released.  Accordingly, the Court cannot determine if the

---

[8] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html

risk to Boney based on his location would be less if he were released compared to if he remained imprisoned.

Finally, Boney raises the purportedly deficient medical care he receives at the BOP, his self-described rehabilitation, and the alleged disparities between his sentence and the sentences for other drug-traffickers as reasons to grant his motion for a reduced sentence.  *See* D.I. 200 at 24-29.  But none of these reasons are identified as "extraordinary and compelling" in U.S.S.G. § 1B1.13 or consistent with that policy statement.

Accordingly, the Court finds that Boney has not identified an extraordinary and compelling reason for a sentence reduction.

## B. A Danger to the Community

Even if Boney had demonstrated an extraordinary and compelling reason, the Court would still deny his motion because he has failed to demonstrate that he is not a danger to the safety of the community, especially after considering the factors set forth in 18 U.S.C. § 3553(a).

Boney attempted to murder a government informant and was willing to murder that informant's child.  Boney committed this offense while he was on pre-trial supervision and after his attempts to pro-actively cooperate with the DEA broke down.  Boney also attempted to intimidate another witness during trial by having his brother send to that witness the message that "snitches get laid in

ditches." D.I. 204 at 16 (citing PSR ¶ 31-32). Thus, Boney was not deterred despite being on federal supervision and knowing that the DEA was monitoring his behavior. Given such brazen conduct, Boney cannot demonstrate that he no longer poses a danger to society.

Nor do the § 3553(a) factors weigh in favor of a sentence reduction. The nature and circumstances of the offense demonstrate that Boney was a sophisticated and violent drug dealer who trafficked in kilos of cocaine. Boney's conduct deserved a lengthy sentence to send a strong deterrent message, whereas a release now would allow him to evade almost half of his sentence

## III.   CONCLUSION

For the foregoing reasons, the Court will deny Boney's Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). D.I. 200.

The Court will issue an Order consistent with this Memorandum Opinion